**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JAMES BERNARD PICKENS**                                          **PLAINTIFF**

**v.**                                          **CIVIL NO. 3:19-cv-00895-DPJ-BWR**

**COMMISSIONER OF SOCIAL**                                          **DEFENDANT**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

Plaintiff James Bernard Pickens brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g) for judicial review of a final decision of the Commissioner of Social Security Administration denying his claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3). At the administrative hearing, Plaintiff withdrew his claim for Disability Insurance Benefits under Title II of the Social Security Act. [8] at 65-66. Having reviewed Plaintiff's Brief [11], the Commissioner's Response [12], Plaintiff's Reply [13], the record [8], and relevant law, it is recommended that the decision of the Commissioner be affirmed because the administrative law judge (ALJ) used proper legal standards and cited substantial evidence supporting her finding that Plaintiff could perform a limited range of light work.

### I. BACKGROUND

On November 10, 2016, when he was thirty-six years of age, Plaintiff filed his SSI application alleging disability due to "physical/eyes." [8] at 27, 207, 209, 235. Plaintiff attended high school through the eleventh grade, speaks English, and obtained a driver's license. *Id.* at 18, 49-50, 234, 236. He was incarcerated from 2002 until 2006

because of an arrest and conviction for aggravated assault. *Id.* at 298. Plaintiff worked as a cook after his release. *Id.* at 50-51. He stopped working in January 2010 because he was incarcerated and convicted of robbery. *Id.* at 235-36. In July 2014, Plaintiff was assaulted by other inmates and stabbed multiple times, including in his torso, right hip, right knee, and left lower leg. He fractured his left wrist, lost his right eye, and broke a tooth. *Id.* at 20, 44, 285, 760. Plaintiff remained incarcerated until November 9, 2016. *Id.* at 64.

Plaintiff's SSI application was denied initially and upon reconsideration. Plaintiff requested a hearing before an ALJ, and an in-person hearing was held on November 28, 2018. *Id.* at 39-83. Plaintiff and a vocational expert testified. On December 18, 2018, the ALJ issued a decision unfavorable to Plaintiff, finding that he suffered from the following severe impairments: "right eye enucleation, post-traumatic stress disorder [PTSD], headaches, status post-left ulnar styloid fracture, tinnitus, status post-broken wrist, and status post-multisystem trauma due to stabbing." *Id.* at 14-28. The ALJ concluded that the record did not contain objective evidence that Plaintiff suffered from schizophrenia. *Id.* at 17.

The ALJ determined that during the adjudicatory period of November 16, 2016, the date Plaintiff filed for SSI, through December 18, 2018, the date of the ALJ's decision, Plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 CFR § 416.967(b) except Plaintiff

> can occasionally balance, kneel, crawl, and climb ramps and stairs. He can frequently stoop and crouch. He can never climb ladders, ropes or scaffolds. He can frequently reach, handle and finger with his dominant upper extremity. He can perform no work requiring precise depth

> perception; similarly, he cannot make accurate judgments of distance or speed. He can perform no work requiring binocular vision, peripheral vision on the blind right side, or driving at night. He must never be exposed to workplace hazards such as moving mechanical parts and high, exposed places. He is limited to a low stress work environment, defined as tasks that are simple and routine in nature and with no more than frequent interaction with supervisors and co-workers, and no interaction with the general public. He is limited to working in an environment with no more than moderate noise level as defined by the SCO. He would be absent from work one day per month.

*Id.* at 19.

The ALJ proposed a hypothetical to the vocational expert with the limitations that she found supported by the record. *Id.* at 68-71. Based on the vocational expert's testimony, the ALJ concluded that Plaintiff could not perform his past work as a cook, a medium and skilled occupation, but could perform other jobs existing in significant numbers in the national economy, such as the light and unskilled occupations of house sitter and order caller. *Id.* at 26, 28. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

On judicial review, Plaintiff challenges the ALJ's findings regarding his musculoskeletal limitations, mental limitations, headaches, and time off task. [11] at 1-20. He argues that the ALJ should have given persuasive weight to three independent medical examination opinions, the first by Howard Katz, M.D., the second by psychologist Angela J. Koestler, PhD, and the third a physical therapy report ordered by Dr. Katz and performed by physical therapist Richard Adam Bell. *Id.* at 11. The ALJ gave Dr. Katz's opinion significant weight. [8] at 25. The ALJ gave Dr. Koestler's opinion little weight. *Id.* The ALJ's decision did not address the physical therapy report. Plaintiff asserts that the ALJ should have addressed the

rehabilitative treatment plan recommended by Dr. Katz and found that the treatment plan required routine absences more numerous than an employer would allow. *Id.*

The Commissioner's counterargument is that the ALJ properly considered the whole record and reached a conclusion that she supported by citing to substantial evidence in the record. [12] at 1-19. The Commissioner emphasizes that the sole responsibility for determining disability is reserved to the Commissioner, and the Court may not reweigh the evidence or substitute its judgment for the Commissioner's. *Id.* at 5.

## II. DISCUSSION

### A. Standard of Review

"The Social Security Administration provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1150 (2019). The federal district courts must uphold the Commissioner's decision to deny social security benefits if it is "supported by substantial evidence and . . . the Commissioner used the proper legal standards to evaluate the evidence." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *see* 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Newton*, 209 F.3d at 452. The Court cannot "reweigh the evidence in the record, try

the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Id.*

"To determine whether a claimant is disabled, the Commissioner's analysis proceeds along five steps." *Webster v. Kijakazi,* 19 F.4th 715, 718 (2021). The Commissioner considers (1) whether the claimant is engaged in "substantial gainful activity," (2) the severity and duration of the claimant's impairments, (3) whether the claimant's impairment "meets or equals" one of the "Listing of Impairments," (4) whether the claimant can still do "past relevant work," and (5) whether the impairment prevents the claimant from doing any relevant work. *Id.* "The claimant bears the burden on the first four steps." *Id.* at 718. "If the claimant advances that far, the burden shifts to the Commissioner to prove the claimant's employability." *Id.*

The "Listing of Impairments" in 20 C.F.R. pt. 404, subpt. P, app. 1, is used at step three and comprised of impairments that are severe enough to preclude a person from performing any gainful activity. *Sullivan v. Zebley,* 493 U.S. 521, 529 (1990). Each Listing is defined in terms of specific medical signs, symptoms, or laboratory results. *Id.* at 530. For a claimant to show that his condition matches a Listing, he must meet all specified medical criteria. *Id.* at 529. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530. The burden of proof is on the claimant to establish that he meets a Listing, and that burden is "demanding and strict." *Falco v. Shalala,* 27 F.3d 160, 162 (5th Cir. 1994).

The residual functional capacity (RFC) assessment is a more detailed assessment than the Listing assessment and is used at steps four and five of the

sequential evaluation process. The RFC is utilized at the fourth step to determine if the claimant can still do past relevant work and at the fifth step to determine whether the claimant can adjust to any other type of work. *See* 20 C.F.R. § 416.920(e) (effective Aug. 24, 2012). The ALJ is solely responsible for determining a claimant's RFC. *Webster,* 19 F.4th at 718. "In doing so, an ALJ examines the medical evidence in the record, including the testimony of physicians and the claimant's medical records." *Id.* It is the ALJ's duty to interpret the medical evidence along with other relevant evidence to determine a claimant's capacity for work. *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012).

The adjudicatory period for an SSI claim is the date of the application through the date of the ALJ's decision. *See* Titles II & XVI: Onset of Disability, SSR 83-20 (S.S.A. 1983) (explaining Title XVI payments are made beginning with the date of application because there is no retroactivity of payment).

B. <u>Plaintiff's Upper-Extremities and Vision</u>

In the July 10, 2014 assault, Plaintiff fractured his left wrist, lost his right eye, and was stabbed all over his body. [8] at 20. Plaintiff alleges that during the adjudicatory period, he experienced significant pain and weakness and decreased range of motion in his left hand and left arm, decreased range of motion in both shoulders, and muscle spasms throughout his body. [11] at 4. Plaintiff argues that he was "severely limited in the use of his dominant arm to light to sedentary work and only occasional use of the arm," he could lift no more than twenty-five pounds," and could only occasionally reach, handle, and finger. *Id.* at 8. The ALJ found that

Plaintiff could "frequently reach, handle and finger with his dominant upper extremity." [8] at 19. Plaintiff claims that he could not "frequently reach, handle and finger" and emphasizes Dr. Katz's opinion that "[a]t this time, he is limited in the use of his left upper extremity to light and sedentary activities." [8] at 771, [11] at 4.

The ALJ considered Dr. Katz's opinion and gave it significant weight. [8] at 25. The ALJ observed that Dr. Katz found "crepitus and a positive drawer of the left wrist, and a weak TFCC with joint instability" and noted Plaintiff's tenderness to palpation of the glenohumeral joint and xiphoid manubrium junction. *Id.* at 21, 768. The ALJ noted that Dr. Katz found normal finger-to-nose coordination and a normal gait except for an arm swing. *Id.* at 21, 769. The ALJ did not adopt Dr. Katz's opinion that Plaintiff was limited in the use of his left upper extremity to light and sedentary activities. *Id.* at 771. She weighed this opinion against other evidence, which she interpreted as supporting the conclusion that Plaintiff could "frequently reach, handle and finger with his dominant upper extremity." *Id.* at 19.

The ALJ cited the opinions of State agency consultants, Thomas Tapley, M.D., and Carol Kossman, M.D. *Id.* at 24, 84-103, 108-25. Drs. Tapley and Kossman concluded that Plaintiff could perform light work and had no postural or manipulative limitations. *Id.* at 91, 101, 122. The ALJ gave these opinions some weight but found the evidence at the hearing supported a more restrictive RFC. *Id.* at 24.

The ALJ reviewed the opinion of consultative examiner Stanley Hartness, M.D. *Id.* at 21, 24, 608-12. Dr. Hartness concluded that Plaintiff could

"lift/carry/push/pull" twenty pounds occasionally and ten pounds frequently and could occasionally handle, finger, and feel. *Id.* at 612. Dr. Hartness determined that Plaintiff had no limitations reaching overhead or forward; normal grip and motor strength in his bilateral upper extremities; normal fine and gross motor skills; and profound vision impairment in the left eye. *Id.* at 21, 24, 610-12. The ALJ gave Dr. Hartness's opinion some weight. The ALJ discounted Dr. Hartness's findings as to Plaintiff's physical limitations because Dr. Hartness found Plaintiff had profound vision loss in his left eye and listed "vision impairment" as the justification for Plaintiff's physical limitations. *Id.* at 24, 612, 754-56. However, an ophthalmology examination showed Plaintiff did not have profound vision impairment in his left eye. The ophthalmology exam showed that Plaintiff was blind in the right eye but "had corrected visual acuity in his left eye of 20/20 at distance and 20/30 near, and full visual fields to confrontation" with a diagnosis of normal vision in the left eye. *Id.*

The ALJ compared the opinions of Drs. Katz, Tapley, Kossman, and Hartness to Plaintiff's actual treatment records and observed the following. After surgical repair of multiple stab wounds and fracture stabilization, Plaintiff "demonstrated improvement as expected" and was discharged from University Medical Center on July 17, 2014. *Id.* at 20, 313-538. Plaintiff presented for right eye surgery at University Medical Center on September 11, 2014 and complained of pain in his fingers, back, legs, head, and neck. *Id.* at 20, 538-44. A physical examination was unremarkable except for light perception in the right eye. *Id.* At a follow-up

appointment on December 12, 2014, a physical examination found normal range of motion and normal gait. *Id.* at 20, 546.

The ALJ considered sick call records from the Mississippi Department of Corrections (MDOC), which did not reflect that Plaintiff complained about or received treatment for upper extremity limitations while in custody. *Id.* at 21, 597-601. Plaintiff presented on January 8, 2016 with complaints of skin dryness and requesting ointment for a skin rash. *Id.* at 21, 588-89. On January 12 and February 3, 2016, Plaintiff requested ointment refills. *Id.* at 21, 590, 597. On June 27, 2016, Plaintiff complained of a cold and requested congestion medicine. *Id.* at 600-01. MDOC sick call records showed that Plaintiff ambulated without difficulty and had normal respiratory effect at the January 8, 2016 visit. *Id.* at 21, 588. A physical examination during the January 12, 2016 visit showed a normal gait, normal range of motion and motor strength without tenderness in all extremities, and a finding that Plaintiff could "undergo exercise testing and/or participate in exercise program." *Id.* at 21, 591

The ALJ observed that after Plaintiff was released from prison on November 9, 2016, he presented at Central Mississippi Medical Center for pain on seven occasions from June 26, 2017 to July 30, 2018. *Id.* at 22, 778-847. Plaintiff complained of muscle spasms throughout his body on June 26, 2017, and a physical examination found limited range of motion of the cervical and lumbar spines, secondary to muscle spasms, but normal motor strength and gait. *Id.* at 22, 845. Plaintiff next presented on October 11, 2017 with complaints of pain in his left wrist and back, and a physical

examination found tenderness to the lumbar spine and limited range of motion secondary to pain. *Id.* at 22, 801. Plaintiff received injections. *Id.* at 801-02.

On October 25, 2017, Plaintiff reported slightly improved pain in his left wrist and reported "[n]o symptoms of back pain, sciatica, neck pain, joint pains, joint stiffness, limitation of joint movement, muscle pain, muscle weakness." *Id.* at 22, 784-86. The ALJ noted that when Plaintiff presented four more times – on December 4, 2017; December 26, 2017; March 16, 2018; and July 30, 2018 – no objective findings of physical limitations were noted. *Id.* at 22. At the December 4, 2017 visit, Plaintiff complained of back pain and received injections but did not report having neck pain, joint pain, limited joint movement, muscle pain, or muscle weakness. *Id.* at 22, 783, 924-25. At the March 16, 2018 visit, Plaintiff complained of persistent back and neck pain with stiffness and was given injections. *Id.* at 22, 919-22. On July 30, 2018, Plaintiff complained of back, neck, and left-hand pain and was given injections. *Id.* at 22, 923-27.

The ALJ considered that Plaintiff presented at the emergency room of St. Dominic-Jackson Memorial Hospital on August 8, 2018 for treatment of mental health symptoms. *Id.* at 22, 949-51. While there, he was given a physical examination which found normal range of motion and muscle strength with no tenderness or swelling. *Id.* at 22, 950.

The ALJ remarked on MRIs. An MRI of Plaintiff's cervical spine from October 2, 2017 was unremarkable and an MRI of Plaintiff's left hand from December 11,

2017 showed wrist joint degenerative changes, primarily involving the lunate, but was otherwise within normal limits. [8] at 22, 863-64.

The ALJ did not address the physical therapy report but did address the opinion of Dr. Katz who ordered the physical therapy report. The Social Security regulations do not include physical therapists in the list of acceptable medical sources who can provide evidence to establish an impairment. 20 C.F.R. § 416.913(d) (effective Sept. 3, 2013 to Mar. 26, 2017). A physical therapist's report is "other source" evidence that "may" provide evidence of the severity of an impairment. *Id.* *See* Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencies, SSR 06-03P (S.S.A. Aug. 9, 2006).

Plaintiff argues that the ALJ should have adopted Dr. Katz's opinion that Plaintiff was "limited in the use of his left upper extremity to light and sedentary activities" due to Dr. Katz's credentials and the scope and breadth of his evaluation. [11] at 11; [13] at 1. But other factors beyond specialization and supportability are considered by the ALJ when weighing medical opinions. 20 C.F.R. § 416.927 (effective Aug. 24, 2012 to Mar. 26, 2017). The factors include the examining relationship; treatment relationship; length of treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability; and consistency. *Id.* The ALJ noted that Dr. Katz provided an independent medical evaluation, meaning he was not a treating physician and did not have a lengthy or

frequent treatment relationship with Plaintiff. [8] at 21. The ALJ discussed the evidence that she found inconsistent with Dr. Katz's opinion about Plaintiff's upper extremity limitations. *Id.* at 21. She found the opinion and Plaintiff's statements not fully consistent with the MRIs of his cervical spine and left hand, his conservative treatment with no recommendation for surgical intervention, and Dr. Hartness's findings that he had no limitations reaching overhead or forward, normal grip and motor strength in his bilateral upper extremities, and normal fine and gross motor skills. *Id.* at 21, 24, 610-12, 863-64.

The ALJ was not required to mirror Dr. Katz's opinion that Plaintiff was limited to light and sedentary work because of left upper extremity limitations, nor was she required to mirror Dr. Hartness's opinion that Plaintiff could occasionally, as opposed to frequently, handle, finger, and feel. It was solely the ALJ's responsibility to weigh the medical experts' opinions, the medical evidence, Plaintiff's statements, and other record evidence to determine Plaintiff's capacity for work. *Taylor,* 706 F.3d at 602.

Plaintiff complains that the vocational expert testified that "the house sitter job requires 'normal' upper extremity use which is not even defined in the Dictionary of Occupational Titles" (DOT). [11] at 9. The vocational expert's full statement was "Extremity use – house sitter, just, actually normal, normal use. You actually could do the job with, with one hand – with one – the house sitter" and "with one eye." [8] at 73. At the administrative hearing, Plaintiff's counsel did not question the vocational expert about whether there was a discrepancy between the DOT and the

expert's use of the term "normal." [8] at 72-80. Plaintiff is not "permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000). Vocational experts may invoke not only publicly available sources, but also information obtained directly from employers and data otherwise developed from their own experience in job placement or career counseling. *Biestek,* 139 S. Ct. at 1152-53. Plaintiff's argument also overlooks that the ALJ found that he could also perform the job of order caller.

Ultimately, Plaintiff is objecting to the weight the ALJ accorded the evidence regarding Plaintiff's upper extremity limitations and vision. A challenge to an ALJ's decision based on evidentiary weight does "not vitiate the evidentiary sufficiency of the ALJ's conclusion." *Walton v. Colvin*, No. 1:13-CV-391-HSO-RHW, 2015 WL 1014263, at *4 (S.D. Miss. Mar. 9, 2015) (citing *Thomas v. Colvin*, 587 F. App'x 162, 164 (5th Cir.2014)). Plaintiff has shown no legal error, and the ALJ supported her conclusion about Plaintiff's vision and upper extremity limitations with substantial evidence.

## C.   Plaintiff's Back and Lower Extremities

Plaintiff testified that he could stand for only forty minutes at one time and walk for only thirty minutes at one time due to pain in his back and lower extremities. [8] at 20. Plaintiff maintained that his muscles lock up, and he has weakness in the knees

that occurs when sitting and walking. [11] at 4. Plaintiff asserted before the ALJ that his lumbar range of motion was limited by pain, he had "left lower leg and ankle range of motion deficits from tissue damage and scarring," "right hip and knee range of motion limited by severe signs of pain," and "muscle spasms in paraspinal muscles so severe" that they required him to lie down until the spasm is released. *Id.* at 6. The ALJ concluded that Plaintiff could "occasionally balance, kneel, crawl, and climb ramps and stairs," "frequently stoop and crouch," and "never climb ladders, ropes, or scaffolds." [8] at 19. Plaintiff claims these findings are unsupported.

The ALJ cited the following evidence in assessing Plaintiff's back and lower extremity limitations. Drs. Tapley and Kossman opined that Plaintiff could perform light work. *Id.* at 24, 91, 101, 122. Dr. Katz's physical examination found tenderness of the left leg, "tenderness to palpation of the right SI joint, left ischia, bilateral trochanters" and "xiphoid manubrium junction," and a normal gait except for an arm swing. *Id.* at 21, 769. An October 2, 2017 MRI of Plaintiff's lumbar spine "showed a disk bulge at L5-S1 with slight effacement of the anterior thecal sac, felt to represent a broad-based disk herniation with an inner annular disruption." *Id.* at 22, 864.

Dr. Hartness observed that Plaintiff "sat comfortably and got on and off the examination table without difficulty." *Id.* at 21, 609. Plaintiff "had motor strength of 3/5 in his bilateral lower extremities, but no noted atrophy." *Id.* at 21, 611. Plaintiff had multiple healed stab wounds and "did not limp, but walked with an unsteadiness, holding onto objects and his wife while ambulating." *Id.* at 21, 610. Concurrently,

14

Plaintiff did not use an assistive device, performed "tandem, toe-heel, hopping and squatting," and had a negative Romberg test. *Id.* at 21, 610.

MDOC sick call records did not reflect that Plaintiff requested or sought treatment for back and lower extremity pain while in custody. *Id.* at 21, 597-601. They showed that Plaintiff ambulated without difficulty and had normal respiratory effect at the January 8, 2016 visit. *Id.* at 21, 588-91. A physical examination during the January 12, 2016 visit showed a normal gait, normal range of motion and motor strength without tenderness in all extremities, and a finding that Plaintiff could "undergo exercise testing and/or participate in exercise program." *Id.* at 21, 591

At Central Mississippi Health Services, Plaintiff complained of muscle spasms throughout his body on June 5, 2017, and a physical examination found limited range of motion of the cervical and lumbar spines, secondary to muscle spasms, but normal motor strength and gait. *Id.* at 22, 843-45. Plaintiff next presented on October 11, 2017 with complaints of pain in his left wrist and back, and a physical examination found tenderness to the lumbar spine and limited range of motion secondary to pain. *Id.* at 22, 801. Plaintiff received injections on October 11, 2017. *Id.* at 801-02. On October 25, 2017, Plaintiff reported slightly improved pain in his left wrist and reported "[n]o symptoms of back pain, sciatica, neck pain, joint pains, joint stiffness, limitation of joint movement, muscle pain, muscle weakness." *Id.* at 22, 784-86.

When Plaintiff presented four more times on December 4, 2017; December 26, 2017; March 16, 2018; and July 30, 2018, no objective findings of physical limitations were noted. *Id.* at 22. At the December 4, 2017 visit, Plaintiff complained of back pain

15

and received injections. *Id.* at 22, 783, 924-25. At the March 16, 2018 visit, Plaintiff complained of persistent back and neck pain with stiffness and was given injections. *Id.* at 22, 919-22. On July 30, 2018, Plaintiff complained of back, neck, and left-hand pain and was given injections. *Id.* at 22, 923-27. When Plaintiff presented to St. Dominic Hospital on August 8, 2018 for mental health symptoms, he had a normal gait, and a physical examination found normal musculoskeletal range of motion and muscle strength with no tenderness. *Id.* at 950.

The ALJ's observation that Plaintiff "complained of back pain during some treatment visits, but generally had a normal gait during physical examinations" is supported by substantial evidence. [8] at 26. Plaintiff again is objecting to the weight the ALJ accorded the evidence, which does "not vitiate the evidentiary sufficiency of the ALJ's conclusion." *Walton,* 2015 WL 1014263, at *4. Plaintiff's treatment records reflected conservative treatment with no recommendation for surgical intervention. While he reported frequent falls to Dr. Katz, Plaintiff used no assistive device and had a normal gait. This evidence and more supports the ALJ's findings regarding Plaintiff's back and lower extremity limitations, and Plaintiff has shown no legal error.

D.    Plaintiff's Mental Capacity and Headaches

The ALJ found at step three that Plaintiff did not meet Listing 12.15 (Trauma and stressor-related disorders) and at step four, crafted a RFC limiting Plaintiff to "a low stress environment, defined as tasks that are simple and routine in nature and with no more than frequent interaction with supervisors and co-workers and no

interaction with the general public" and "limited to working in an environment with no more than moderate noise level as defined by the [Selected Characteristics of Occupations]." [8] at 19. Plaintiff argues that the ALJ erred by concluding that he did not meet Listing 12.15 and in crafting a RFC that did not consider the extent of his limitations due to PTSD and chronic, debilitating headaches. [11] at 8. According to Plaintiff, he managed PTSD symptoms during the adjudicatory period by completely avoiding others "due to paranoia, delusions, irritability, [and] otherwise antisocial behavior" and could not work a full day without rest because debilitating, pounding headaches caused him to lose "six to eight hours per day to sleep or lying in a dark room." [11] at 4, 6, 8, 10, 12; [13] at 3.

The severity of mental disorders in the Listing of Impairments is measured using medical criteria (paragraph A), functional criteria (paragraph B), and an analysis of "serious and persistent mental disorders" (paragraph C). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(a)-(c). Listing 12.15 required Plaintiff to prove that he met the criteria of paragraphs A *and* either B or C. The ALJ's decision only provides an analysis of the paragraph B criteria, and because her conclusions on the paragraph B criteria are supported by substantial evidence, Plaintiff has not demonstrated that the ALJ erred in finding that he did not meet Listing 12.15.

To meet the paragraph B criteria, Plaintiff had to prove that his symptoms caused at least one extreme or two marked limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing himself. [8] at 17. The ALJ

determined that Plaintiff had no extreme or marked limitations. *Id.* at 18. She found that Plaintiff had moderate limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; no limitation regarding concentrating, persisting, or maintaining pace, and mild limitation in adapting and managing himself. *Id.*

The ALJ cited the following three reasons in support of her conclusion that Plaintiff did not have at least one extreme or two marked limitations in the paragraph B criteria. First, she remarked that Plaintiff completed the eleventh grade, obtained a driver's license, and reported a good relationship with his wife of three years. *Id.* at 18, 49-50, 900. Second, she observed from the treatment records that Plaintiff "reported irritability and moodiness, and presented with mildly anxious and depressed mood during some treatment visits . . . , but generally had normal mood, affect, and behavior during mental status examinations . . . ." *Id.* at 18, 49. Third, the ALJ highlighted that Plaintiff "denied difficulty focusing during treatment visits . . . ." *Id.* at 18.

Plaintiff does not deny the evidence of his education, marriage, and driving status, but instead argues that the ALJ should not have based her decision that he had only moderate limitations interacting with others on the fact that he had a good relationship with his wife of three years and otherwise should not have based her paragraph B findings on "snapshots of Claimant's mood and effect on the few mental health consults that he attended." [11] at 16. The ALJ acted within her discretion to interpret Plaintiff's three-year marriage as undermining his claim of total social

avoidance and a total inability to interact with others. Plaintiff points to his arrests, incarcerations, fighting, "cussing people out," and a treatment record reflecting that he threatened to "beat up staff" after being told to "wrap up a phone call" before a group therapy session as evidence that he has marked or extreme limitation in the paragraph B criteria. [11] at 13, [13] at 4. Plaintiff's pointing to evidence that could have supported a different conclusion does "not vitiate the evidentiary sufficiency of the ALJ's conclusion." *Walton,* 2015 WL 1014263, at *4. "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Newton,* 209 F.3d at 452 (quoting *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir.1990)).

The ALJ's observation from the treatment records that Plaintiff "generally had normal mood, affect, and behavior during mental status examinations" and denied difficulty focusing is supported by the record. When he presented at Central Mississippi Medical Center on June 5, 2017 and October 11, 2017, Plaintiff was noted to have euthymic mood, appropriate affect, intact memory, good insight, and appropriate judgment. [8] at 800-01, 844-45. He denied difficulty focusing on June 5. *Id.* at 849. When he presented to Central Mississippi Medical Center on October 25 and December 4, 2017, Plaintiff denied anxiety, depression, moodiness, difficulty focusing, memory loss, or changes in sleep pattern. *Id.* at 783, 786.

Plaintiff acknowledges his "scant mental health treatment." [13] at 4. He attended only three appointments at Hinds Behavioral Health Services for mental health treatment, with dates of treatment on June 15, July 23, and August 20, 2018. *Id.* at 898-906. He was initially assessed on June 15, 2018 and reported nightmares,

flashbacks, insomnia, anxiety, depressed mood, sadness, irritability, and a loss of interest in activities previously enjoyed. *Id.* at 23, 898-900. Plaintiff had labile mood and affect and endorsed paranoid delusions but had appropriate speech, behavior, appearance, thought content, memory, insight and judgment, and estimated average intelligence. *Id.* at 23, 900. Plaintiff was diagnosed with PTSD and major depressive order, moderate and single episode. *Id.* at 23, 903. On July 23, 2018, Plaintiff had a mildly anxious mood with depressed affect but spontaneous speech, intact memory, good insight and judgment, and estimated average intelligence. *Id.* at 23, 905-06. He was diagnosed with PTSD, unspecified depressive disorder, and mild cannabis use. *Id.* On August 20, 2018, Plaintiff complained of a depressed mood and irritability due to his inability to work and intermittent anxiety attacks described as fast breathing and the inability to relax. *Id.* at 904. He had depressed and mildly anxious mood and affect but no obvious impairment of orientation or memory. *Id.*

Plaintiff presented at St. Dominic Hospital for mental health treatment on August 7, 2018 and November 14, 2018. *Id.* at 22, 24, 878-896, 928-71. The ALJ observed that Plaintiff reported having PTSD and not schizophrenia during inpatient treatment at St. Dominic Hospital in August 2018 and was found to have no psychotic symptoms. But, when Plaintiff presented at St. Dominic again on November 14, 2018, he complained of auditory hallucinations and reported a history of schizophrenia, noncompliance with medication, and cannabis use. *Id.* at 17, 953, 969. The ALJ remarked that a note in the November 14 records indicated the staff's concern that Plaintiff was misusing medical facilities to avoid a court date. *Id.* at 17, 969. Plaintiff

20

was medicated and hospitalized "given his past history of PTSD . . . to monitor the patient overnight to determine his relative risk of self-harm" and discharged with diagnoses of PTSD and drug-induced mood disorder. *Id.* at 17, 966-69.

Plaintiff's arguments regarding his mental limitations primarily rest on Dr. Koestler who opined that Plaintiff "should be considered to have significant impairment in social and occupational functioning and it is highly unlikely from a psychological standpoint, that his symptoms will resolve and he will be able to return to gainful employment." *Id.* at 915. The ALJ gave little weight to Dr. Koestler's opinion because the opinion "contains no specific functional limitations in vocationally relevant terms, and the claimant generally denied symptoms during treatment visits." *Id.* at 25.

Plaintiff does not contest that Dr. Koestler's opinion did not contain specific functional limitations in vocationally relevant terms. A medical expert's understanding of the Commissioner's disability programs and their evidentiary requirements is an appropriate consideration when weighing expert opinion. *See* 20 C.F.R. § 416.927(c)(6) (effective Aug. 24, 2012 to Mar. 26, 2017). The ALJ was not required to address Dr. Koestler's opinion that Plaintiff was highly unlikely to return to gainful employment because that statement is an opinion on an issue reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d) (effective Aug. 24, 2012 to March. 26, 2017).

Plaintiff claims that the ALJ ignored his testimony that he loses "six to eight hours per day to sleep or lying in a dark room" because of headaches. [11] at 8, 12;

[13] at 3. The ALJ did not ignore Plaintiff's testimony but did not fully credit his statements about the intensity, persistence, and limiting effects of his symptoms. [8] at 20. While Plaintiff reported to Dr. Katz that he experienced headaches every day lasting six to eight hours, the ALJ observed that Plaintiff denied routine headaches at the April 6, 2017 ophthalmology exam and again at Central Mississippi Medical Center on October 25, 2017. *Id.* at 21, 754-56.

The ALJ recognized that Plaintiff suffered from PTSD, headaches, and tinnitus. The ALJ tracked in the RFC Dr. Katz's opinion that Plaintiff should be limited to a low stress environment with the need to avoid loud noises due to headaches, tinnitus, and anxiety. [8] at 19, 772. The RFC limited Plaintiff to tasks that are simple and routine with no more than frequent interaction with supervisors and co-workers, and no interaction with the general public." *Id.* at 19. Plaintiff's minimal mental health treatment, combined with his inconsistent reports of symptoms, and Dr. Katz's recommendation that Plaintiff be limited to a low stress environment with the need to avoid loud noises are substantial evidence supporting the ALJ's findings regarding headaches and mental health symptoms. No legal error or lack of substantial evidence has been shown.

E.    Dr. Katz's Rehabilitative Plan of Care

Plaintiff submits that the ALJ did not consider the durational requirements or effects of the rehabilitative plan of care recommended by Dr. Katz on Plaintiff's ability to engage in gainful employment. [11] at 11. He asserts that "[t]here is no support in the record for the ALJ's RFC (time off task) finding that [Plaintiff] would only miss

one day of work." [13] at 3. Dr. Katz opined that Plaintiff required 24 to 36 sessions of physical therapy, twelve sessions of occupational therapy, twelve psychiatric evaluations, and fifty psychological counseling sessions. [13] at 2. According to Plaintiff, the roughly 115 separate clinical appointments over the span of one year recommended for him by Dr. Katz for physical and mental limitations would equate to Plaintiff being absent from work 2.73 days per month, which is more than the vocational expert testified that an employer would allow. [11] at 2, 5-6, 12.

"The effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)" are considered in making the RFC assessment. *See* Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). The United States Court of Appeals for the Fifth Circuit held in *Newton* that, "if an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." 209 F.3d at 459. The Social Security regulations and *Newton* speak of medical treatment in the present tense. *See Sly v. Kijakazi*, No. 321CV00208TSLRHWR, 2022 WL 2082318, at *3 (S.D. Miss. May 24, 2022), report and recommendation adopted, No. 3:21-cv-208-TSL-RHWR, 2022 WL 2079874 (S.D. Miss. June 9, 2022). Dr. Katz's treatment plan did not reflect actual treatment during the adjudicatory period of November 10, 2016 through December 18, 2018, and Plaintiff's actual record of treatment during this period was minimal in comparison. Plaintiff has cited no law in support of his

argument that the rehabilitative plan of care, which spoke to what might occur in the future if Plaintiff complied, was required to be addressed in the ALJ's decision.

## III. RECOMMENDATION

The ALJ's decision should be affirmed and Plaintiff's Complaint [1] dismissed with prejudice.

## IV. NOTICE OF RIGHT TO OBJECT

Within fourteen days after being served with a copy, any party may serve and file with the Clerk of Court written objections to this Report and Recommendation. Within seven days of service of the objection, the opposing party or parties must either serve and file a response or notify the district judge that they do not intend to respond to the objection. L.U.Civ.R. 72(a)(3).

A district judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. *See* 28 U.S.C. § 636(b)(1).

An objecting party must specifically identify the findings, conclusions, and recommendations to which he objects. A district judge need not consider frivolous, conclusive, or general objections. A party who fails to file written objections to the proposed findings, conclusions, and recommendations shall be barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal

conclusion adopted by the Court to which he did not object. *Douglass v. United Servs. Auto. Assoc.,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

**SIGNED,** this the 12th day of December, 2022.

*s/ Bradley W. Rath*

HONORABLE BRADLEY W. RATH
UNITED STATES MAGISTRATE JUDGE